CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

OCT 21 2010

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 5:08-cr-00005-7 |
| ) | (Civil Action No. 5:10-cv-80221) |
| v. ) | |
| ) | **MEMORANDUM OPINION** |
| ) | |
| EFRAIN SANCHEZ APARICIO, ) | By: Hon. Glen E. Conrad |
| ) | Chief United States District Judge |
| Defendant. ) | |

The defendant, a federal inmate, brings this Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255. After an evidentiary hearing before United States Magistrate Judge B. Waugh Crigler on the government's motion to dismiss, and after fully briefing the motion, the defendant filed objections to the Magistrate Judge's Report and Recommendation. The government does not object to the Report and Recommendation, making the matter ripe for the court's consideration. For the reasons that follow, the court finds that additional arguments and/or de novo evidentiary proceedings would assist its resolution of this case. Accordingly, the parties are instructed to render arguments in accordance with the following opinion.

I. **Background**

This case arises from an international conspiracy to steal birth certificates and Social Security cards (the "source documents"), market them to undocumented aliens living in the United States, and assist these aliens in procuring state-issued identification documents by fraudulently using the stolen source documents to establish a false identity. Many of the source documents involved in this conspiracy originated in Puerto Rico, where thieves targeted the record-rooms of public schools, which kept their students' authentic birth certificates and social

security cards on file. Puerto Rican source documents are particularly valuable to peddlers of identity documents, because the holder is identified as an American citizen and—because Puerto Ricans do not pay federal income taxes—the Social Security numbers associated with the documents are not typically cross-referenced in any federal database, making it easier for an impersonator to evade detection.

In this particular case, a certain Luis Toro, who was operating in Puerto Rico, sold hundreds of stolen source documents to Edwin Mendez, who was located in Harrisonburg, Virginia. Many of the documents were matched sets of Social Security cards and birth certificates. Efrain Sanchez Aparicio ("Sanchez" or the "defendant") was one of Mendez's "runners"; that is, Sanchez personally sold the documents that were supplied to him by Mendez to undocumented aliens for $500 to $700 apiece. Sanchez also transported these individuals to confederates in Ohio, who helped them procure Ohio identification cards using the illegally-obtained source documents. Many of these undocumented aliens subsequently obtained employment in western Virginia. Sanchez was responsible for approximately one hundred undocumented aliens illegally obtaining identification cards from the State of Ohio over his one-and-a-half year involvement in the conspiracy.

After a lengthy investigation conducted by special agents of the Department of Homeland Security's Immigration and Customs Enforcement agency, several of the conspirators, including Sanchez, were arrested. On September 2, 2008, Sanchez pled guilty to Counts One and Two of the indictment returned against him, which charged him with conspiracy to possess and transfer unlawfully obtained identification documents in violation of 18 U.S.C. § 1028(a) and with

aggravated identity theft under 18 U.S.C. § 1028A(a)(1), respectively.[1] Count Three, which charged Sanchez with conspiracy to commit identity theft in violation of 18 U.S.C. § 1028(f), was dismissed on the government's motion. The plea agreement entered into by Sanchez and the government specified that Sanchez waived his right to appeal or collaterally attack his sentence and conviction.

The guilty plea hearing was held before United States Magistrate Judge B. Waugh Crigler. At the hearing, the government proferred a factual basis for the guilty plea which described the conspiracy and the roles of the co-conspirators. The factual basis did not state that the stolen identity information belonged to actual persons, however, nor did it state that Sanchez knew that the source documents belonged to other actual people. With regard to Sanchez, the factual basis indicated only that he "transferred source documents and assisting [sic] in transporting individuals who had entered the United States illegally to Ohio," that he sold certain source documents to a confidential informant who was making a controlled buy on November 19, 2007, and that he asked the confidential informant whether he was available to travel to Ohio to obtain an Ohio identification card.

At the plea hearing, Judge Crigler ascertained that Sanchez "underst[ood] that [he was] also charged in Count 2 with aggravated identity fraud," and that Sanchez had consulted with his attorney. No objections were filed to the Magistrate Judge's report and recommendation to accept Sanchez's guilty plea, and the district court accepted the plea on October 7, 2008. The court sentenced Sanchez on December 10, 2008 to a term of twenty-four months of imprisonment followed by three years of supervised release on Count One, and to a consecutive term of twenty-

---

[1] The indictment originally identified Sanchez as "Juan LNU."

four months of incarceration followed by three years of supervised release on the aggravated identity theft charge. Sanchez accordingly began to serve his term of incarceration and did not file a direct appeal.

Subsequently, the United States Supreme Court handed down its decision in Flores-Figueroa v. United States, 129 S. Ct. 1886 (2009), holding that, to support a conviction for aggravated identity theft under § 1028A(a)(1), the government must show not simply that the defendant knew that the identification was counterfeit, but that "the defendant knew that the 'means of identification' he or she unlawfully transferred, possessed, or used, in fact, belonged to 'another person.'" 129 S. Ct. at 1886. Flores-Figueroa abrogated the previously-controlling authority in the United States Court of Appeals for the Fourth Circuit, United States v. Montejo, 442 F.3d 213 (4th Cir. 2006), which had held that the prosecution need not prove that the defendant knew that the identification actually belonged to another person.

Sanchez, proceeding pro se, filed the present petition seeking habeas corpus relief under 28 U.S.C. § 2255 on January 20, 2010, essentially alleging that (a) his guilty plea was not knowingly and voluntarily made because the scienter requirement of identity theft was not explained to him, (b) that he is actually innocent of aggravated identity theft under Flores-Figueroa, and (c) that the indictment defectively failed to identify a predicate felony necessary to support an aggravated identity theft charge. The government moved to dismiss Sanchez's petition, claiming that he voluntarily waived his right to collaterally attack his sentence in his plea agreement, that the evidence available at his guilty plea showed that he knew the identity documents in question actually belonged to another person, and that Count Two of the indictment was not faulty in failing to cross-reference a violation under § 1028A(c). After reviewing the

4

pleadings, the court referred the case to Judge Crigler for an evidentiary hearing on Sanchez's Flores-Figueroa claim. The federal public defender's office was appointed to represent Sanchez at the hearing, and accordingly filed a brief in support of Sanchez's petition and represented him at the hearing.

At the evidentiary hearing before Judge Crigler, the government introduced two exhibits and the testimony of Special Agent Cosme, who had been in charge of the investigation into the conspiracy. Exhibit One contained copies of the matching Social Security card and Texas-issued birth certificate that the confidential informant had purchased from Sanchez during the controlled buy on November 19, 2007. Although Cosme testified that the documents were "authentic" inasmuch as they were actually issued by the proper governmental authorities, the government did not present evidence that the person in whose name the documents were issued was an actual person. Exhibit Two was a list of individuals whose stolen documents were intercepted en route between Puerto Rico and Harrisonburg, Virginia. The government had ascertained that each of these individuals were actual persons, but there was no indication that Sanchez even knew that these particular documents existed.

With respect to Sanchez's knowledge that any of the stolen documents belonged to actual people, Cosme described how the cards were stolen in Puerto Rico and then transported to Mendez. Cosme then detailed the controlled buy that occurred on November 19, 2007:

> Initially, Mr. Sanchez guaranteed a Puerto Rican birth certificate with a matching Social Security card. . . . [But] then when we made the transaction, the undercover buy, he said, well, there was a problem with the Puerto Rican birth certificate at the time. He had not received his supply. He indicated that he could provide [the confidential informant] an authentic, valid Texas birth certificate with a matching Social Security card. So, therefore, we made that purchase off of him.

(Tr. at 34.) When the court asked him to define the term "authentic," Cosme replied that "[a]n authentic document is a document that's issued by the appropriate issuing authority . . . normally a government agency." Id. Cosme indicated that the term "valid" had a synonymous meaning. Id.

When the court pressed him to explain how Sanchez could have known that the Texas documents belonged to a real person when the government had failed to ascertain that they belonged to a real person, Cosme explained, "Because . . . during the controlled buy, he told the confidential informant that he was guaranteeing this because of his contact in Texas. He was guaranteeing that this was a valid, authentic document." (Tr. at 39.) Further, indicated Cosme, the entire purpose behind the sale of these documents was to provide undocumented aliens with a "document that was valid enough to afford [them] the ability to seek employment." (Tr. at 38.)

Finally, the court queried whether it was Cosme's "factual position that the entire operation could not succeed unless actual people in Puerto Rico or Texas were utilized in order to get the documents for the benefit of those who were going to use them." (Tr. at 42.). Cosme replied that this characterization of his position was correct: "That's how their business was garnered . . . and that's how come they had the ability to charge a high premium." (Tr. at 42.) Cosme also testified that the documents involved in Sanchez's case were sold for a higher price than compared to other identity and benefit fraud investigations he had been involved in over the course of his career. (Tr. at 50.)

The government also submitted portions of the testimony of Sanchez's fellow conspirators at a previous trial for one of the co-conspirators. Nevertheless, although the testimony indicates that at least some of the co-conspirators knew that the documents belonged to actual people, there was no testimony indicating personal knowledge of this fact on the part of Sanchez.

Judge Crigler issued a report and recommendation on September 16, 2010, recommending that the court dismiss Sanchez's petition. Sanchez, by counsel, filed an objection to the report and recommendation on October 4, 2010. The government did not object to Judge Crigler's report and recommendation, making the matter ripe for the court's resolution.

## II. Discussion

To state a claim for relief under § 2255, a federal defendant must prove that one of the following occurred: (1) his sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose such a sentence; (3) the sentence was in excess of the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255(a). In a § 2255 motion, the defendant bears the burden of proving grounds for a collateral attack by a preponderance of the evidence. Miller v. United States, 261 F.2d 546, 547 (4th Cir. 1958).

### A. Waiver of Right to Collaterally Attack the Conviction

The parties initially dispute whether Sanchez's plea agreement waived his right to collaterally attack the validity of his conviction. Certainly, just as a defendant may waive his right to appeal his conviction and sentence, he may also "waive his right to attack his conviction and sentence collaterally, so long as the waiver is knowing and voluntary." United States v. Lemaster, 403 F.3d 216, 220 (4th Cir. 2005). See also United States v. Marin, 961 F.2d 493, 496 (4th Cir. 1992).

In the analogous context of appeal waivers, the Fourth Circuit analyzes their enforceability under a two-step process: "[W]e will enforce the waiver to preclude a defendant from appealing a specific issue if the record establishes that the waiver is valid and that the issue being appealed is

within the scope of the waiver." United States v. Blick, 408 F.3d 162, 168 (4th Cir. 2005). The Fourth Circuit has determined that "errors that the defendant 'could not have reasonably contemplated' when the plea agreement was executed"—such as the complete denial of counsel in any proceedings following the plea or the imposition of a sentence that exceeds the statutory maximum—are not within the scope of the waiver and are thus appealable by the defendant. United States v. Poindexter, 492 F.3d 263, 270 (4th Cir. 2007) (quoting Blick, 408 F.3d at 172). Moreover, courts typically "refuse to enforce an otherwise valid waiver if to do so would result in a miscarriage of justice." United States v. Johnson, 410 F.3d 137, 151 (4th Cir. 2005) (quoting United States v. Andis, 333 F.3d 886, 891 (8th Cir. 2003)). See also Blick, 408 F.3d at 170 n. 10 ("Although we have not used the term miscarriage of justice in analyzing appeal waivers, the concept seems to be subsumed within our analysis of the scope of the waiver.").

Here, Sanchez mounts his collateral attack against the validity of his guilty plea itself, claiming that it was not knowing and voluntary because "neither he, nor his counsel, nor the court correctly understood the essential elements of the crime with which he was charged." Bousley v. United States, 523 U.S. 614, 618 (1998). Because Sanchez "could not have reasonably contemplated" that the trial court's proper application of Montejo would be later deemed erroneous by Flores-Figueroa, the court concludes that he did not waive his right to collaterally attack his plea on these grounds.

Moreover, to allow Sanchez's waiver (which was predicated on his plea) to preclude an attack on the plea itself would beg the question: it assumes the validity of the plea in order to bar a challenge to the plea's validity. See Jones v. United States, 167 F.3d 1142, 1145 (7th Cir. 1999) ("Justice dictates that a claim of ineffective assistance of counsel in connection with the

negotiation of a cooperation agreement [waiving § 2255 rights] cannot be barred by the agreement itself—the very product of the alleged ineffectiveness."). See also United States v. Bell, 359 F. App'x 442, 444 (4th Cir. 2010) (unpublished) ("[T]he Government's argument essentially admits that Bell's appeal challenges the validity of Bell's guilty plea, an attack that would not be barred by Bell's appeal waiver."); United States v. Linder, 561 F.3d 339, 341 n. 2 (4th Cir. 2009) ("Linder was entitled to appeal, despite the appellate waiver, if only to challenge the enforceability of that waiver."); United States v. Mader, 251 F.3d 1099, 1103 (6th Cir. 2001) (holding that provision in plea agreement waiving defendant's right to appeal sentence did not waive defendant's right to appeal validity of plea). The unpublished cases in which the Fourth Circuit has held that defendants' claims of actual innocence were barred by a collateral attack waiver accord with this reasoning, as they have each involved defendants who neither challenged the validity of their guilty pleas nor predicated such a claim on the grounds of actual innocence. See, e.g., United States v. Dungee, 228 F. App'x 298, 303 (4th Cir. 2007) (unpublished); United States v. Pickens, 201 F. App'x 143, 145 (4th Cir. 2006) (unpublished) ("As Pickens' guilty plea was valid, he waived all antecedent nonjurisdictional defects, including claims of actual innocence."); United States v. Parker, 176 F. App'x 358, 359 (4th Cir. 2006) (unpublished).

Finally, to the extent that Sanchez argues that he is a "victim[] of a fundamental miscarriage of justice," because "a constitutional violation has probably resulted in the conviction of one who is actually innocent," Murray v. Carrier, 477 U.S. 478, 495-96 (1986)), Fourth Circuit precedent counsels against a finding that such a claim is foreclosed by his collateral attack waiver. See United States v. Johnson, 410 F.3d at 151 (noting courts' refusal "to enforce an otherwise valid waiver if to do so would result in a miscarriage of justice"). The court therefore concludes

that Sanchez's waiver of his right to collaterally attack his conviction and sentence did not waive his right to collaterally attack the validity of his guilty plea or to argue his actual innocence under Flores-Figueroa.

B. Procedural Default

Sanchez is incorrect, however, in believing that he may challenge the validity of his guilty plea for the first time in his § 2255 petition. As Bousley made clear, Sanchez's failure to contest the validity of his guilty plea on direct appeal has procedurally defaulted his claim. The facts of Bousley are directly on point. There, the habeas petitioner had pled guilty to "using" a firearm in violation of 18 U.S.C. § 924(c)(1). 523 U.S. at 616. Five years after his plea, the Supreme Court held in Bailey v. United States, 516 U.S. 137 (1995), that the term "use" in § 924(c)(1) meant that the government must prove that a defendant actively employed the firearm rather than simply possessed it. Id. at 144. Bousley then sought habeas relief, arguing that his guilty plea was not knowing and voluntary because he was misinformed by the trial court as to the nature of the crime. Bousley, 523 U.S. at 616. The Court observed that, if "neither [Bousley], nor his counsel, nor the court correctly understood the essential elements of the crime with which he was charged," his plea was constitutionally invalid. Id. at 618-19. However, the Court did not reach the merits of Bousley's claim because of the "significant procedural hurdles" to such a consideration:

> We have strictly limited the circumstances under which a guilty plea may be attacked on collateral review. 'It is well settled that a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked.' And even the voluntariness and intelligence of a guilty plea can be attacked on collateral review only if first challenged on direct review. Habeas review is an extraordinary remedy and 'will not be allowed to do service for an appeal.' Indeed, 'the concern with finality served by the limitation on collateral attack has special force with respect to convictions based on guilty pleas.'

10

Id. at 621 (citations omitted). Noting that Bousley had failed to challenge the validity of his plea on appeal, the Court therefore concluded that he had "procedurally defaulted the claim he now presses on us." Id. The Court remanded the case, determining that if Bousley could demonstrate that he was "actually innocent" of the crime, "he will then be entitled to have his defaulted claim of an unintelligent plea considered on its merits." Id. at 624.

Bousley compels the conclusion that Sanchez, by failing to challenge the validity of his guilty plea on direct appeal, has procedurally defaulted this claim. See Bousley, 523 U.S. at 621-22; United States v. Mikalajunas, 186 F.3d 490, 492-93 (4th Cir. 1999). For the same reasons, Sanchez's claim that § 1028A(a)(1) required proof that he knew the stolen source documents were not merely counterfeit but belonged to another person is procedurally defaulted. See ids.

"Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.'" Bousley, 523 U.S. at 622 (citing Carrier, 477 U.S. at 485, 496). Sanchez does not argue that his procedural default should be excused under the cause and prejudice standard, and it is evident that any such attempt would be unavailing. The cause and prejudice standard requires the petitioner to show not only that "some objective factor external to the defense" impeded his efforts to raise the issue on direct review, Coleman v. Thompson, 501 U.S. 722, 753 (1992), but also that the error he alleges "worked to his actual and substantial disadvantage." United States v. Frady, 456 U.S. 152, 170 (1982). A habeas petitioner cannot establish cause for his failure to raise an issue on direct appeal simply because it would have been futile for him to do so under then-existing precedent: "[F]utility cannot constitute cause if it means simply that a claim was unacceptable to that particular court at that

particular time." Bousley, 523 U.S. at 623 (quotations omitted). Nor does a subsequent court decision demonstrate cause for a petitioner's default unless the procedurally defaulted claim "is so novel that its legal basis was not reasonably available to counsel." Reed v. Ross, 468 U.S. 1, 16 (1984); Williams v. French, 146 F.3d 203, 209 (4th Cir. 1998). By the time of Sanchez's December 10, 2008 sentencing, three Circuit Courts had held that § 1028A(a)(1) required proof of the defendant's knowledge that the identification belonged to another person. See United States v. Godin, 534 F.3d 51 (1st Cir. 2008); United States v. Miranda-Lopez, 532 F.3d 1034 (9th Cir. 2008); United States v. Villanueva-Sotelo, 515 F.3d 1234 (D.C. Cir. 2008). As a result, Sanchez cannot establish cause for his default, even though Montejo was the controlling authority at the time in which he could have directly appealed his sentence.

His claims may still be reviewed in a habeas proceeding, however, if he can establish that he is the "victim[] of a fundamental miscarriage of justice"; that is, that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Carrier, 477 U.S. at 495-96. Under Bousley, the actual innocence exception to the procedural default bar applies when a post-conviction change in the substantive law potentially shows that the petitioner was convicted for conduct that the law does not criminalize. 523 U.S. at 623. To establish actual innocence, Sanchez must demonstrate that, "in light of all the evidence," "it is more likely than not that no reasonable juror would have convicted him." Schlup v. Delo, 513 U.S. 298, 327-28 (1995) (citation omitted). As the Supreme Court has underscored,

> [A]ctual innocence means factual innocence, not mere legal insufficiency. In other words, the Government is not limited to the existing record to rebut any showing that petitioner might make. Rather, on remand, the Government should be permitted to present any admissible evidence of petitioner's guilt even if that evidence was not presented during petitioner's plea colloquy and would not

12

normally have been offered before our decision in Bailey [clarifying the elements of the crime with which the defendant was charged]. In cases where the Government has forgone more serious charges in the course of plea bargaining, petitioner's showing of actual innocence must also extend to those charges.

Bousley, 523 U.S. at 623-24.

In this case, although the parties have presented some argument and evidence on Sanchez's actual innocence claim, it appears that the parties were not clear that Sanchez's claim regarding the validity of his guilty plea was procedurally defaulted in light of Bousley.[2] Accordingly, the court deems it advisable that the parties re-focus their arguments in light of the foregoing analysis and directs that additional arguments and/or de novo evidentiary proceedings be scheduled in this case. See 28 U.S.C. § 636(b)(1).[3, 4]

---

[2] Of course, "procedural default is normally a defense that the State is obligated to raise and preserve if it is not to lose the right to assert the defense thereafter." Trest v. Cain, 522 U.S. 87, 89 (1997). But Sanchez conceded in his initial petition that he had procedurally defaulted his claims. See Pet. at 10-11. The government also argued procedural default in its motion to dismiss the petition. See Mot. to Dismiss at 7, 9-11. See also Yeatts v. Angelone, 166 F.3d 255, 261 (4th Cir. 1999) ("[A] federal habeas court possesses the authority, in its discretion, to decide a petitioner's claim on the basis of procedural default despite the failure of the state to properly preserve procedural default as a defense."). Subsequent filings appear to have overlooked the government's initial assertion of this defense.

[3] It would appear at this juncture, without the more focused argument which this opinion will produce, that the evidence of actual innocence is extremely close. In the final analysis, it would appear that the only evidence the government can point to regarding the requisite scienter is Cosme's testimony concerning the confidential informant's purchase of the Texas documents and Sanchez's "guarantee" that the documents were "valid" and "authentic," coupled with the fact that Sanchez sold a significant number of illegal documents, and that the documents were sold at a premium. As noted above, however, although Cosme testified that Sanchez claimed the Texas documents were authentic, Cosme's testimony still did not establish that these documents belonged to another actual person. Nor was there any other testimonial evidence that directly demonstrated that Sanchez knew that the documents belonged to other people as opposed to being merely counterfeit. As for the pricing of the documents, there is no evidence that Sanchez determined their asking price based on an understanding of their origin, as opposed to some other co-conspirator such as Mendez, who clearly understood how the documents had been procured. Accordingly, the court has determined to set this matter down for additional proceedings. If either side wishes to present additional evidence at the supplemental proceeding, the proceeding will be re-characterized as an evidentiary hearing.

[4] The court notes that the burden is upon Sanchez to "demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." Bousley, 523 U.S. at 623 (citations omitted). Moreover, Sanchez has not attempted to establish his innocence with respect to Count Three of the indictment, which charges him with conspiracy to commit identity fraud. See id. at 624 ("In cases where the Government has forgone more serious charges in the course of plea bargaining, petitioner's showing of actual innocence must also extend to

C. The Indictment's Cross-Reference to a Predicate Felony

Sanchez's remaining argument is speedily dealt with. Section 1028A(a)(1) provides that "[w]hoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years." Id. Subsection (c) provides that the term "felony violation enumerated in subsection (c)" includes any offense that is a felony violation of "any provision contained in this chapter (relating to fraud and false statements), other than this section or section 1028(a)(7)." 18 U.S.C. § 1028A(c)(4).

Sanchez claimed in his initial pro se petition that Count Two of the indictment was defective because it failed to cross-reference a charge under § 1028(c). Count Two charged that Sanchez violated § 1028A(1)(a) "during and in relation to knowingly trafficking in false and actual authentication features for use in false identification documents, documents-making implements and means of identification, in violation of Title 18, United States Code, Section 1028(c)(8)." As Sanchez correctly notes, 18 U.S.C. § 1028(c)(8) does not exist. However, the language recited in the indictment is identical to the language of 18 U.S.C. § 1028(a)(8). Thus, as counsel for Sanchez recognizes, "what the government undoubtedly meant to charge was § 1028(a)(8)." See Mem. Supp. Pet. at 7. The court concurs with the petitioner that "18 U.S.C. § 1028(a)(8) is the predicate felony offense charged." See Pet. Obj. to R. and R. at 8. Sanchez's argument that the indictment was defective is therefore without merit.

---

those charges."); United States v. Montano, 398 F.3d 1276, 1285 (11th Cir. 2005); Lyons v. Lee, 316 F.3d 528, 533 n. 5 (4th Cir. 2003). The court therefore deems it advisable to receive argument on the proper disposition or remedy in the event that Sanchez demonstrates his actual innocence with respect to Count Two.

14

## IV. Conclusion

For these reasons, the court adopts the Report and Recommendation in part and directs that additional arguments and/or de novo evidentiary proceedings be scheduled in accordance with the foregoing analysis.

The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 21st day of October, 2010.

_____
Chief United States District Judge